HENRY A. WYMAN, TRUSTEE ET AL., *v.* MELINDA
MITCHELL ET AL.

Plymouth, October, 1904.

*Evidence — Opinion — Expert Testimony — Surveyor —
Ancient Bounds — Adverse Possession — Indian Titles
and Occupation.*

These cases are petitions for the registration of title to
certain tracts of land lying within the limits of Betty's Neck,
a point lying between Assawampsett and Pocksha Ponds in
Lakeville, which, at a meeting of the Proprietors of Assa-
wampsett Neck, May 11, 1697, was layed out, as a part of
lands then rightly belonging to the Indians, to one Betty
Sausaman, under whom the respondents claim title by devise
and descent.

The respondent, Melinda Mitchell, a woman of intelli-
gence and education and a well known authority on matters
of Indian history and tradition in this locality, appears
officially in this case in full Indian costume, with paint,
feathers and wampum, as the Princess Teweelema, and
claims the land in her Indian right as being the last remain-
ing property of the aborigines, land which has never come
under the private dominion of the white man. The claim
is a somewhat startling one, but is presented in good faith
and with the assistance of learned and able counsel. The
respondents trace, and it is admitted prove, their descent
from Wattuspaquin, otherwise known as the Old Black
Sachem, a sister of King Philip. Wattuspaquin and her
son conveyed this property to the Indian Assowetough, known
to the English by the name of Betty, by a deed which ran to

the said Betty " forever and especially her eldest daughter." Betty later by her will devised this property to her eldest daughter and her heirs forever, and of the said eldest daughter the present respondents are the only living heirs. Betty's grand-daughter and her descendants have ever since lived on a portion of the land where there still stands a house occupied by these respondents.

Betty's great-grandson, one Paul Squin, had a house on a part of the Wyman tract, together with a garden and an orchard of wild apple trees, some of which were planted by the said Paul; and Paul's sister, who was the grandmother of the present respondents, lived on the lot now occupied by the respondents, and also after Paul's death cultivated the tract on which he had lived, and sold apples from his orchard. Later she moved to Abington, but continued to plant crops on different portions of the Wyman lot, and once a year to gather them, and continued to use the orchard until her death in 1839. Since then the respondents have from time to time gathered apples from the orchard, cut fire wood wherever and whenever they pleased, and pastured two or three cows on the Wyman tract.

The petitioners claim the land both by grant and by prescription. They show a complete record title since 1832, claiming under one Noah Clark, who lived on the Wyman tract not far from the Squin house prior to 1806, at which time no one other than Clark and the Squins lived on any of the lands in controversy. The Wyman tract has been cleared, fenced, and portions of it occupied for crops and for pasturage for over fifty years by the petitioners and their predecessors in title. The standing wood has been several times cut by them and either sold or burned for charcoal, and the charcoal burner boarded with the respondents for several weeks during one period of burning on the Wyman tract. All of the parcels which constitute the land in question have been severally assessed since 1853 to the recorded

owners under whom the petitioners claim title, and the taxes have been paid by them. There has been but little actual occupation of the DeMoranville land, and the boundary lines of that tract are extremely vague. No Indian occupation has been shown in regard to it. The petitioner, DeMoranville and his predecessors in title have cleared it, sold off the wood, at times fenced it, planted a portion of it, and paid taxes on the whole. The boundaries called for by the deeds and made use of on the grounds have been merely ditches. The surveyors employed by the respective parties have made an attempt to plot this tract from the deeds. The petitioners' surveyor has further made a plot from an elaborate survey and study of all neighboring tracts, and of all of the grants and deeds of the Indian lands that can be found of record. I admit his plot and conclusions in evidence, and adopt his boundaries except in so far as they have been encroached on by the respondents' fence. The land actually occupied and fenced by the respondents, now and for over twenty years past, is not claimed by the petitioners.

The matter of the admissibility of the plot made by the petitioners' surveyor raises a question which has several times arisen in this court, and as to which there seems to be very little authority, and no decision exactly in point. The principle involved, and the cases appearing on it, are very fully discussed in Wigmore on Evidence, Sections 1917-1926. The two objections made to the admissibility of this plot are the familiar ones that opinion is not evidence, and that the matter in question is the very matter to be passed upon by the Court. Unquestionably it lies at the very foundation of the law of evidence that a witness must be a knower and not a guesser, but back of that and at the basis of the question whether the witness is a knower or a guesser lies the further question whether he is testifying from facts or merely from hearsay. The opinion of the expert which is based on facts is itself fact, or the nearest approach to fact

that is available. Lord Mansfield in the old case of Folkes *v.* Chadd, 3 Dougl. 157, rests his decision practically on this ground, and so, to quote one of the very few "surveyor" cases to be found in the books, the court in Forbes *v.* Caruthers, 3 Yeates 527, says, "Mere abstract opinion is not evidence, but a surveyor or any other person conversant on the subject may state facts, and his opinion on those facts." In Forbes *v.* Caruthers, as in all of the early cases, the "opinion" of the witness was not the material part of his testimony; it was the "facts" that lay within his peculiar knowledge. The "facts" themselves in many cases of "opinion" testimony, however, were so very peculiarly within the sole knowledge of the witness, or of others possessing his peculiar qualifications, that the line of demarcation between facts and opinion in such cases became less and less clearly marked until it fairly disappeared in the typical instance of what afterward became known as the "expert," the man to whom alone, to the exclusion alike of court, jury, and the ordinary witness, the facts are known or properly comprehendible, and whose conclusions based on the best and only available data, namely, that of his own experience, are in themselves much more essentially fact than they are opinion. The only test as to such evidence is, and always has been, merely whether the witness has a sufficient basis of personal acquaintance with the matter, a sufficient amount of his own "facts," i. e., his own personally observed data, to justify listening to his opinions, or accepting his conclusions, as evidence. Wigmore, p. 2546, sec. 1917. The objection that the witness is, in a way, passing upon the very question before the Court is not necessarily fatal to the admissibility of his testimony. Transportation Line *v.* Hope, 95 U. S. 297; Poole *v.* Dean, 152 Mass. 589. The admissibility of the assistance of skilled persons to aid the court has been recognized from as far back as 1333. Wigmore, section 1917, and cases there cited. The expert is not presented as

a side judge, he is presented as a witness, and his conclusions, or opinions, or however otherwise they may be fairly designated, are offered merely as evidence; in substance and in reality as " facts," to be, like all the other facts and evidence, properly weighed and considered by the court. It was to the confusion between " opinion " which was mere guess work and " opinion " which really represented an ultimate conclusion or statement of fact arrived at by one exclusively, either as an individual or as a member of a limited class, possessing the peculiar and necessary data for stating the fact, that is to be attributed much of the loose and misleading language to be found in some of the decisions in the early American cases on which has been founded the doctrine that opinion is not evidence, and that a witness can not testify to an inference which it is for the court or the jury to draw if the facts warrant it. The true rule, as pointed out by Professor Wigmore, seems to be merely the old and really basic rule for the exclusion of superfluous matter. If the facts are within the ken of the court, the expert is not needed, his opinion adds nothing to the facts in the case, and his testimony is not admissible. If on the other hand his " opinion " is really a statement or presentation of fact not otherwise available, and drawn from his own peculiar experience and knowledge, whether he be a scientist or merely a layman with exclusive and unusual personal data, his testimony is really evidence, and admissible as such. The whole matter was stated with characteristic succinctness by the late Chief Justice Doe in State v. Pike 49 N. H. 399, 423: — " Opinions, like other testimony, are competent in the class of cases in which they are the best evidence." See also note to Greenleaf on Evidence, section 440 A, and the cases there cited.

The matter of qualification raises a distinct, though correlative, proposition. It rests upon the same broad principle however. Unless his facts are facts, he can not state their sum, substance or result. Neither can he do so unless his

opportunities for observation and conclusion have been such as to enable him to properly state the results or substance of the data which he has acquired. He must not only have had personal observation, but be also possessed of special skill in interpreting the result, and if the court has the same skill, the witness' inferences or " opinion " must be rejected, and rejected as before, simply because it is superfluous. " A practical surveyor cannot be asked whether in his opinion from the objects and appearances which he saw on the ground, the tract he surveyed was identical with the tract marked on a certain diagram." Greenleaf, Section 440 A. In the case at bar, however, the witness had made a special study of the entire tract covered by the Indian grant or reservation, not only by surveys on the ground, but by a study of all of the records and deeds relating to it. This same question has arisen in the somewhat similar cases of ancient mill privileges, and of the proprietors' allotments of common lands in the Essex woods and elsewhere. In ordinary cases this court is, or ought to be, in itself expert in determining the location even of ancient grants, and yet there is nothing in my own experience as to which, from the rapid changes that have taken place in certain localities, expert testimony has become more useful and even necessary to the court than as to the matter of ancient land marks and boundaries. The question seems to me to be fairly akin to that of testimony as to value, and I think the evidence admissible.

So far as the petitioners' title by grant is concerned the land appears to be a portion of that which was before the court in the case of Clark v. Williams, 19 Pick. 499. Whether the plaintiff in that case is the same Noah Clark as the one under whom the petitioners claim, does not appear. However that may be, the language of the court in that case seems applicable to the case at bar. " After a lapse of two hundred years, we are to presume that the township of

Middleborough " (from which Lakeville was set off in 1853) " was duly granted to the Proprietors, and set off to hold in severalty amongst themselves, and that the Indian right of occupancy shall be presumed to have been extinguished, unless the contrary is shown.   When a small tract of land in an old settled town has been occupied by a person of Indian origin, in the same manner that similar lots are occupied by white settlers, we think it is not now to be presumed from the circumstance of his Indian origin alone that the aboriginal right of occupancy has not been extinguished, and that he holds under that right."   The respondents claim that in the case at bar the contrary is shown, and that the land in question was by the vote of 1697 expressly set off from the lands granted to the Proprietors, and laid out to the then Indian owners, whose Indian right of occupancy, it is shown by the evidence in this case, has not been extinguished.   The petitioners rest their case, however, principally upon title by adverse possession.   As to this claim the case appears to be perfectly simple.   However unfortunate it may be from the standpoint of those who at this day sympathize with the Indian race, it is nevertheless a fact, that the laws, customs and dominion of the white man and not those of the Indian have prevailed even, and perhaps particularly, to the extent of recognizing and legalizing titles acquired by adverse possession.   Whether this be simply the right of might, or as it may be more fairly regarded, the proper, just and necessary foundation of the whole English law of real property, it is the sort of occupation and possession necessary and proper to the needs of the white man rather than that necessary to the needs of the red man that is the test as to the acquirement of title by adverse possession.   The Indians did not at first apparently grasp the idea of individual ownership in fee, and in selling land to the white men seemed to consider that they were simply admitting them to joint privileges in the tribal property, without thereby excluding themselves.

The rights of the Indian occupying land expressly reserved for Indian use and occupation are expressly and carefully guarded by the ordinances both of the Massachusetts and the Plymouth colonies so as to prevent their elimination, and this was done both to prevent the Indian from being imposed upon, and also to protect the government in its exclusive privilege of extinguishing and acquiring the Indian's right of occupancy when circumstances might warrant it. See Clark *v.* Williams, *supra.* The present Indian claim is not made under any such right. These respondents claim under Assowetough or Betty, to whom the land was originally set off by the Proprietors of Middleborough, both by descent and by deed. As to all of the land it seems to me that the claim of title and the mode of use thereunder by the Indians has been characteristic of Indian occupation, while that of the white man has been such as by law creates, and conclusively establishes, ownership against it.

Decree for the petitioners.

J. J. Higgins for petitioners.

L. E. Chamberlain and G. W. Stetson for respondents.